691 A.2d 837

JOHN PINKOWSKI AND DIANN RICHES PINKOWSKI, PLAIN-TIFFS–APPELLANTS, v. TOWNSHIP OF MONTCLAIR, A MU-NICIPAL CORPORATION, DEFENDANT–RESPONDENT, v. ALFRED J. CLARK, INC. AND ALFRED J. CLARK, THIRD–PARTY DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted March 10, 1997—Decided April 7, 1997.

Before Judges PETRELLA, WALLACE and KIMMELMAN.

*Ferguson & Gille,* attorneys for appellants (*Grant M. Gille* and *Adam L. Levine,* on the brief).

*Robert A. Hoonhout,* Township Attorney, attorney for respondent (*Richard Seltzer,* Assistant Township Attorney, on the brief).

No other parties participated in this appeal.

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

This case arises out of the construction, approximately seventy years ago, of an underground cement culvert or pipe through which flows a portion of Nishuane Brook, a natural water course. Plaintiffs, John and Diann Pinkowski, appeal from the Law Division's grant of summary judgment in favor of Montclair Township.

Montclair's motion for summary judgment was granted in a March 25, 1996 order and opinion. For purposes of the motion, the court assumed that Montclair constructed the culvert. The judgment dismissed their suit against Montclair for trespass, inverse condemnation, and negligence.

The Pinkowskis argue on appeal that the judge erred by (1) applying the Tort Claims Act bar against subrogation claims to plaintiffs individually, rather than restricting its application to the title insurance company as subrogee; (2) failing to reach issues of the Township's negligence, palpably unreasonable conduct, gross negligence, and recklessness, conduct that would render inapplicable the limited immunity under the Tort Claims Act; (3) failing to recognize the Township's trespass as a valid claim based on misapplication of the Tort Claims Act ban on claims by subrogees; and (4) failing to recognize plaintiffs' right to be secure in the ownership and possession of their property by concluding that the actions of Montclair could not constitute a taking.

The first count of the complaint alleged that the existence of the culvert on the property constituted a trespass. Count two sought relief through inverse condemnation on the ground that the location of the culvert prevented the Pinkowskis from building on the property and deprived them of beneficial use of their land. Count three alleged negligence by the Township in failing to properly record an easement for the culvert and in approving a subdivision of the parcel from which 20 Melrose Place was created without acknowledging the existence of the culvert.

Alfred J. Clark, Inc. and Alfred J. Clark (Clark) were joined by Montclair as third-party defendants. Montclair alleged that Clark breached his duty to the Township by failing to discover the culvert when he surveyed the property for the 1987 application for minor subdivision approval submitted by the Pinkowskis' predecessor in title. The Pinkowskis then filed a cross-claim against

Clark, alleging negligence.[1]

On December 14, 1995, the Pinkowskis and Montclair filed a stipulation of facts identifying the Pinkowskis' title insurance company as the true party-in-interest insofar as any alleged misfeasance caused a diminution in the property's value. The stipulation notes that the title insurance company paid the Pinkowskis approximately $80,000, and took an assignment of the Pinkowskis' interest in the property.

During the 1920's an underground culvert was built three feet below the surface that was approximately six feet wide and four feet high. The culvert relocated part of the Nishuane Brook from a surface level brook to an underground waterway. The culvert runs south and east through the center of the plaintiffs' property connecting two storm drains which run parallel to each other along Melrose Place and the rear boundary of plaintiffs' lot. Before construction of the culvert, Nishuane Brook ran above ground on the property in question. The brook runs above ground in certain locations as close as 100 feet from the Pinkowskis' lot.

Apparently, an easement for the construction of the culvert beneath the property was never recorded and there is no record of the culvert within the property's chain of title. At the time the culvert was constructed, the property, a vacant lot (now known as 20 Melrose Place), was owned by Lila J. Tufts as part of a larger lot which included the subject property and the immediately adjacent lot to the east. Over the past seven decades the combined parcel was owned by approximately six different owners. On April 13, 1987, the immediate predecessors in title to the Pinkowskis, Dennis and Mary Fry, were granted minor subdivi-

---

[1] After the summary judgment motion was granted, the Pinkowskis and Clark entered into a stipulation of settlement and the dismissal of the Pinkowskis' cross-claim against Clark, subject to its reinstatement if the Pinkowskis successfully appealed the decision.

sion approval so that they could sell the undeveloped lot, presumably unaware of the underground culvert.

The Pinkowskis purchased the lot from the Frys in 1992, and obtained a permit to construct a one-family home. However, the culvert precluded their proposed development. The title insurance company, Osage Corporation, a subsidiary of Commonwealth Land Title Insurance Company, reimbursed the Pinkowskis for the purchase price of the property, took title to it, and became subrogated to the Pinkowskis ownership rights. The Pinkowskis apparently contend that they are entitled to seek additional damages on their own behalf.

Although the record does not include the deed to the property or the contract of sale, it does include a recorded easement to Montclair on September 22, 1919, by several property owners including Ms. Tufts, providing Montclair with a ten foot right of way to construct a storm drain and sewer along the southern boundary of the property. Although the easement describes the right of way as running parallel to Melrose Place from Harrison Avenue east to the western boundary of Nishuane Brook, it does not indicate the location of Nishuane Brook. Clark's 1987 survey also did not depict the location of Nishuane Brook or the culvert.

The culvert was discovered by the Pinkowskis' contractor upon excavation for the foundation. The Pinkowskis claim that the property is not buildable because of the location of the culvert and that the cost of relocating the culvert would be approximately $243,000.

I.

In considering whether a trial court properly granted summary judgment, we review the trial court's decision under the same standard that applies in the trial courts. *Antheunisse v. Tiffany & Co.*, 229 *N.J.Super.* 399, 402, 551 *A.*2d 1006 (App.Div. 1988), *certif. denied,* 115 *N.J.* 59, 556 *A.*2d 1206 (1989). *See also Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 666 *A.*2d 146 (1995).

The Pinkowskis argue that the motion judge improperly applied the Tort Claims Act's (*N.J.S.A.* 59:1–1, *et seq.*) (Act) prohibition against subrogation. Arguing that they also claimed damages on their own behalf for injuries not covered under their title insurance policy, the Pinkowskis contend that the judge improperly applied *N.J.S.A.* 59:9–2e. They argue that the Act contemplates that they may receive compensation from different sources and that the Act permits recovery from both an insurer as well as a public entity or employee so long as the proceeds from the insurance policy are offset against any damages awarded for the misfeasance of the public entity or employee. Thus, the Pinkowskis argue that the judge should have permitted their claims insofar as they related to damages they suffered which were not compensated for by their insurance policy.

The Pinkowskis allege that Montclair was palpably unreasonable in constructing the culvert beneath their property without recording an easement, and that, several decades later, records in Montclair's Engineering Department should have put Montclair on notice of the culvert's location when the Frys requested subdivision approval and they applied for a building permit.

The Pinkowskis also contend that Montclair should be estopped from asserting immunity under the Act. They argue that Montclair was the only party that knew the location of the culvert through its engineering maps, and knew that the Pinkowskis were intending to build a home on the lot when they applied for a building permit. In addition, they claim that Montclair prevented them from discovering the existence of the culvert by failing to place the culvert's existence, in the form of a recorded easement, within the property's chain of title. Thus, the Pinkowskis argue, the judge erred in according Montclair immunity.

The judge dismissed count one (trespass) and count three (negligence in the issuance of subdivision approval and failure to record an easement) on the ground that *N.J.S.A.* 59:9–2e provided

immunity to Montclair.[2]

*N.J.S.A.* 59:9–2e states in pertinent part:

No insurer or other person shall be entitled to bring an action under a subrogation provision in an insurance contract against a public entity or public employee.

The immunity provided governmental entities under the Act is limited to tort based liability. *Feinberg v. State, D.E.P.,* 137 *N.J.* 126, 133, 644 *A.*2d 593 (1994). The policy underlying *N.J.S.A.* 59:9–2e "reflects a recognition that profit-making insurance companies are in a better position to withstand losses which they contract for than are the already economically burdened public entities." *See* comment to 59:9–2; *see also Travelers Ins. Co. v. Collella,* 169 *N.J.Super.* 412, 415, 404 *A.*2d 1250 (App.Div.1979). In addition, *N.J.S.A.* 59:9–2e was designed to prevent plaintiffs from obtaining a double recovery by requiring that any insurance proceeds or other collateral compensation paid to the plaintiff for the alleged injuries sustained as a result of the governmental entity's negligence be subtracted from any judgment against the governmental entity. *N.J.S.A.* 59:9–2e; *Sikes v. Township of Rockaway,* 269 *N.J.Super.* 463, 466, 635 *A.*2d 1004 (App.Div.), *aff'd,* 138 *N.J.* 41, 648 *A.*2d 482 (1994).

Accordingly, *N.J.S.A.* 59:9–2e "has been construed to bar an action where an insurance company has paid its named insured the amount of a loss and then sought to recover that entire amount from a public entity." *D'Annunzio v. Wildwood Crest,* 172 *N.J.Super.* 85, 88, 410 *A.*2d 1180 (App.Div.1980) (citing *S.E.W. Friel Co. v. New Jersey Turnpike Auth.,* 73 *N.J.* 107, 113, 373 *A.*2d 364 (1977)). Nonetheless, a plaintiff may assert a claim against a municipality for damages separate and distinct from those for which the plaintiff already received collateral compensa-

---

[2] The Pinkowskis' attorney informed the judge that additional damages beyond the purchase price of the property were being alleged, to which the court stated it would not eliminate "anybody's interest." Nonetheless, the attorney for the title insurance company responded to the judge's characterization of the case as not truly a subrogation claim by stating, "In every sense it's a subrogation claim."

tion. *N.J.S.A.* 59:9–2e; *Sikes v. Township of Rockaway, supra,* 269 *N.J.Super.* at 466, 635 *A.*2d 1004; *Hayes v. Pittsgrove Tp. Bd. of Educ.,* 269 *N.J.Super.* 449, 454, 635 *A.*2d 998 (App.Div.1994); *see also* Margolis & Novack, *Claims Against Public Entities,* comment to 59:9–2e, at 161 (1995).

To the extent the title company is seeking reimbursement for its payment to the Pinkowskis under their title insurance policy, the Law Division's dismissal of the claims for trespass and negligence was proper. The Act clearly prohibits subrogation claims against governmental entities and employees arising out of any injuries for which the governmental entity or employee may be held liable in tort. *See N.J.S.A.* 59:9–2e. The title company is also prohibited from asserting the rights of the Pinkowskis for damages they may be entitled to for injuries they suffered in addition to the property's loss in value. *Hayes v. Pittsgrove Tp. Bd. of Educ., supra,* 269 *N.J.Super.* at 456–457, 635 *A.*2d 998. Simply put, the title company may not sue Montclair as a subrogee of the Pinkowskis' rights. *See N.J.S.A.* 59:9–2e.

The Pinkowskis, however, assert that they are still entitled to seek recovery on their own behalf for losses attributable to Montclair's grant of their building permit, its minor subdivision approval, its failure to record the existence of the easement in the property's chain of title, and its trespass on their land, as separate and distinct from the loss associated with the value of the land. Such losses include the cost of hiring an architect and general contractor, additional closing costs, and furnishings for the house that was to be built. *N.J.S.A.* 59:9–2e does permit an insured to assert a claim against a municipality under the Act for injuries which the insured suffered, and for which the insured is uncompensated, so long as the right of the insured to assert such a claim has not been subrogated to the insurer. To the extent the Pinkowskis assert such a claim it is not barred by *N.J.S.A.* 59:9–2e. Nonetheless, their claims fail for other reasons as hereinafter stated.

## II.

■ Plaintiffs' claim against Montclair on the basis of negligence in granting subdivision approval and issuance of a building permit is barred by other provisions of the Act. *N.J.S.A.* 59:2–5 grants immunity for injuries arising out of the issuance of a permit or other license, whether based upon a discretionary or ministerial exercise of governmental authority. *Malloy v. State,* 76 *N.J.* 515, 520, 388 *A.*2d 622 (1978); *Simon v. Nat. Com. Bank of N.J.,* 282 *N.J.Super.* 447, 457, 660 *A.*2d 558 (App.Div.1995); *Vacirca v. Consolidated Rail Corp.,* 192 *N.J.Super.* 412, 417, 470 *A.*2d 50 (L.Div.1983). Such immunity has been described as absolute. *Vacirca v. Consolidated Rail Corp., supra,* 192 *N.J.Super.* at 417, 470 *A.*2d 50. Moreover, as the Supreme Court has noted, "[a]lthough a public entity is generally liable for the ordinary negligence of its employees in the performance of ministerial duties, *N.J.S.A.* 59:2–2; *N.J.S.A.* 59:2–3d, that liability yields to a grant of immunity." *Pico v. State,* 116 *N.J.* 55, 62, 560 *A.*2d 1193 (1989) (citing *Malloy v. State, supra,* 76 *N.J.* at 520–521, 388 *A.*2d 622 (other citations omitted)).

■ The Act also provides "absolute immunity for public entities and employees with respect to injuries attributable to 'inspections.'" *Bombace v. City of Newark,* 125 *N.J.* 361, 367, 593 *A.*2d 335 (1991); *see also N.J.S.A.* 59:2–6; 59:3–7. This immunity applies to the governmental entity's failure to inspect as well as its negligent or inadequate inspection. *N.J.S.A.* 59:2–6; 59:3–7.

■ Plaintiffs' negligence theory is that Montclair should not have impliedly represented that their lot was buildable by approving the Frys' minor subdivision application in 1987 and by granting their application for a building permit because they should have known that the culvert existed and would prevent them from building on the lot. Thus, the Pinkowskis' claims for damages arising out of claims alleging negligent issuance of minor subdivision approval as well as a building permit are barred by *N.J.S.A.* 59:2–5 and 59:2–6.

█ Insofar as Montclair raised the statute of limitations defense below, we note that in the absence of a valid easement an unauthorized entry upon the Pinkowskis' land would constitute a continuing trespass as the culvert is still on the land. *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 280 *N.J.Super.* 320, 327, 655 *A.*2d 447 (App.Div.1995), *aff'd in part and rev'd in part*, 144 *N.J.* 84, 675 *A.*2d 1077 (1996). If the presence of the culvert under their property constituted a trespass or continuing trespass, the Pinkowskis might have an action against Montclair, assuming the owner at the time of the culvert's construction had not acquiesced in or approved of its presence on their land. Thus, there might be an issue of whether the six year statute of limitations for actions for trespass against real property would bar the Pinkowskis' claim. Nonetheless, we need not resolve this issue as we hold that plaintiffs' trespass claim cannot stand.

█ An action for trespass arises upon the unauthorized entry onto another's property, real or personal. *State v. Wouters*, 71 *N.J.Super.* 479, 485, 177 *A.*2d 299 (App.Div.1962). "[A] trespass on property, whether real or personal, is actionable, irrespective of any appreciable injury." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 *N.J.* 37, 45, 477 *A.*2d 1224 (1984) (citing *Wartman v. Swindell*, 54 *N.J.L.* 589, 590, 25 *A.* 356 (E. & A. 1892)). Under a trespass theory, a plaintiff may " 'assert a claim for whatever damages the facts may lawfully warrant.' " *Szymczak v. LaFerrara*, 280 *N.J.Super.* 223, 233, 655 *A.*2d 76 (App.Div. 1995) (quoting *Marder v. Realty Construction Co.*, 43 *N.J.* 508, 511, 205 *A.*2d 744 (1964)). Thus, a plaintiff may claim damages from the loss in value to the land trespassed upon, as well as consequential damages such as property taxes and loss of profits. *Ibid.*

█ While a municipality enjoys immunity for its exercise of discretion and judgment in the development of a sewer and drainage plan, such immunity does not protect it from liability for the creation of a nuisance or actual trespass. *See generally Barney's Furniture Warehouse v. Newark*, 62 *N.J.* 456, 466, 303

*A.2d* 76 (1973); *Russo Farms, Inc. v. Vineland Bd. of Educ.*, *supra*, 280 *N.J.Super.* 320, 655 *A.2d* 447; 18A *McQuillin, Municipal Corporations*, § 53.121, at 224–25 (3d ed., 1993); 11 *McQuillin, supra* (§ 31.12, at 178–179).

Nonetheless, the dispositive issue regarding the Pinkowskis' trespass claim is whether Montclair's entry was authorized as a matter of law. In determining that there was no taking by inverse condemnation the motion judge concluded that the culvert was constructed through an implied easement created by the existence of the Nishuane Brook, a natural water course. *See Grammas v. Colasurdo*, 48 *N.J.Super.* 543, 553, 138 *A.2d* 553 (App.Div.1958) ("[T]he upper owner may 'go upon the servient estate at all reasonable times * * * to remove * * * obstructions interfering with [the] use of the way....' "); *Mancini v. DeLillis*, 1 *N.J.Super.* 490, 494, 65 *A.2d* 90 (Ch.Div.1948) (" 'If it is a mere ditch, and the complainant's land has enjoyed the use of it for more than twenty years, and as an adverse right, then it is an easement which the owner of the complainant's land has in that of the defendants; it is a privilege without profit, and is as much the subject of protection as a natural water-course.' ") (quoting *Earl v. DeHart*, 12 *N.J.Eq.* 280, 285 (E. & A. 1856)). This reasoning is applicable to determining whether, as a matter of law, Montclair committed a trespass against the Pinkowskis' land. To the extent Montclair had a right of entry to maintain an implied easement the culvert constituted an authorized entry.

More importantly, the existence of a natural water course does not constitute an encumbrance upon the title to the land over which the water course runs. *Stanfield v. Schneidewind*, 96 *N.J.L.* 428, 431, 115 *A.* 339 (Sup.Ct.1921); *Natland Corp. v. Baker's Port, Inc.*, 865 *S.W.2d* 52, 63–64 (Tex.Ct.App.1993). In *Stanfield v. Schneidewind, supra*, the court reasoned that a natural water course does not create an easement or other encumbrance upon the land as "[t]he right to the natural flow of water is not an easement, but a natural right." *Id.* at 430, 115 *A.* 339. The court indicated that the mere fact that the natural water course in

that case was submerged within an underground culvert did not change the legal character of the water course. Thus, the underground culvert did not constitute an encumbrance or easement in breach of the deed's warranty against encumbrances. *Id.* at 431, 115 *A.* 339;[3] *see also Natland Corp. v. Baker's Port, Inc., supra,* 865 *S.W.*2d at 64 ("[W]e believe that the patent and grant merely restated and clarified the general public right to fish and hunt in navigable waters even on privately-owned submerged lands. The recreational use provision was thus merely *descriptive* of rights that the public already had and did not act as an additional *limitation* on title."). Nor did it constitute a trespass.

The existence of Nishuane Brook created rights to the natural flow of that water course in all the riparian owners (including Montclair as a public entity) over whose land the brook ran. The brook itself is part of the estate in land, not an easement. If an easement exists, it is for the entry upon another riparian owner's land to secure one's right to the natural flow of the water course. *Grammas v. Colasurdo, supra,* 48 *N.J.Super.* at 553, 138 *A.*2d 553; *Mancini v. DeLillis, supra,* 1 *N.J.Super.* at 494, 65 *A.*2d 90.[4] Thus, the motion judge was correct in conclud-

---

[3] It appears that during the late 19th and early 20th centuries it was not uncommon for municipalities to construct such culverts and bridges on private property for the benefit of the public and the private land owner. *Spencer v. Freeholders of Hudson Cty.,* 66 *N.J.L.* 301, 304, 49 *A.* 483 (E. & A.1901). In *Spencer* the court held that the county was under no duty to maintain a bridge or culvert it erected upon private property as the structure became part of the private land for which the county held no responsibility. *Id.* at 303–304, 49 *A.* 483.

[4] Water courses in New Jersey are regulated by the State. *N.J.S.A.* 58:1A–2 "declares that the water resources of the State are public assets of the State held in trust for its citizens." The Water Supply Management Act authorizes the Commissioner of the Department of Environmental Protection to issue regulations regarding the diversion of water. *N.J.S.A.* 58:1A–5. Thus, the consumption and management of water is subject to both common law rights vested in riparian land owners as well as the statutory regulations contained in the Water Supply Management Act. *N.J.S.A.* 58:1A–1 *et seq.* Previously, surface waters

ing that the construction of the culvert did not change the use of the property or the legal character of the brook. Even if it were negligence for Montclair or Mrs. Tufts (the original owner of the lot) not to record the existence of the easement and the culvert, there is nothing to indicate that the actual construction of the culvert altered the course of Nishuane Brook.[5] Hence, the construction of the culvert was not an unauthorized entry and Montclair was under no obligation to inform the Pinkowskis of the culvert's existence because the culvert is part of the estate itself and did not alter the legal character of Nishuane Brook.

Moreover, the recorded instruments in the property's chain of title, as well as the fact that Nishuane Brook runs above ground only a short distance from the property, should at the very least have raised a strong suspicion that an underground stream, or even a culvert, ran beneath the property. Nishuane Brook is an above ground brook on the other side of Melrose Place, approximately 100 feet away from the property. In addition, the 1919 easement granted to Montclair for the construction and maintenance of a drainage pipe along the southern boundary of the property, as well as Clark's surveys, clearly state that the drainage system connects with Nishuane Brook just south and east of the property. As the motion judge concluded, "an appropriate search certainly would have raised the question" as to where Nishuane Brook was located.

### III.

Finally, we address the inverse condemnation argument. The constitutional prohibition against the taking of private property for public use was designed "to bar Government from forcing some people alone to bear public burdens which, in all

were under the supervision of the Water Supply and Policy Commission. *See* *N.J.S.A.* 58:1–1 *et seq.;* now repealed.

[5] The Pinkowskis' right to their title insurance proceeds under their policy is unaffected by our decision.

fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 *U.S.* 40, 49, 80 *S.Ct.* 1563, 1569, 4 *L.Ed.*2d 1554, 1561 (1960). An unconstitutional taking occurs not only when the state actually physically occupies private property for public use, it also occurs when the government's excessive use of police powers results in a denial of all economically beneficial use of the property. *Dolan v. City of Tigard,* 512 *U.S.* 374, 385–87, 114 *S.Ct.* 2309, 2316–17, 129 *L.Ed.*2d 304, 316–317 (1994); *Washington Market Enterprises v. Trenton,* 68 *N.J.* 107, 117–118, 343 *A.*2d 408 (1975).

An inverse condemnation proceeding is one through which a land-owner seeks compensation for a *de facto* taking of their property. *Johnson v. Essex County,* 223 *N.J.Super.* 239, 258, 538 *A.*2d 448 (L.Div.1987) (citation omitted). "[A] property owner is barred from any claim to a right to inverse condemnation unless deprived of all or substantially all of the beneficial use of the totality of his property *as the result of excessive police power regulation.*" *Orleans Builders & Developers v. Byrne,* 186 *N.J.Super.* 432, 446–447, 453 *A.*2d 200 (App.Div.1982) (emphasis added) (citing *Penn Central Transp. Co. v. New York City,* 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.*2d 631 (1978) (other citations omitted)). In addition, "not every impairment of value establishes a taking." *Washington Market Enterprises v. Trenton, supra,* 68 *N.J.* at 116, 343 *A.*2d 408. To constitute a compensable taking, the land owner must be deprived of all reasonably beneficial use of the property. *Lucas v. South Carolina Coastal Council,* 505 *U.S.* 1003, 1014–18, 112 *S.Ct.* 2886, 2892–95, 120 *L.Ed.*2d 798, 812–814 (1992); *Washington Market Enterprises v. Trenton, supra,* 68 *N.J.* at 117–118, 343 *A.*2d 408.

Thus, it is a basic requirement of inverse condemnation that the plaintiff-land owner show that any deprivation of the beneficial use of his property is the result of the exercise of government authority and that the property has in fact been impaired. *Washington Market Enterprises v. Trenton, supra,* 68 *N.J.* at 116, 343 *A.*2d 408 ("The general question as to *when*

*governmental action amounts to a taking* of property has always presented a vexing and thorny problem. If there has been a taking, both Federal and State Constitutions require the payment of compensation...." (emphasis added) (citations omitted)).

The Pinkowskis' inverse condemnation claim is without merit. While it may be true that the subdivided lot is not economically buildable as presently configured, it was not Montclair's construction of the culvert which created that condition. The culvert does nothing more than enclose a natural water course that has always traversed the lot [6] and hindered construction of a house conforming with local zoning without the cost and expense of obtaining governmental approvals and possible relocation of the brook. If the Pinkowskis have suffered damage it was not from the construction of the culvert, it was from the lack of adequate notice provided within the property's chain of title or inadequate inquiry at the time of purchase. This is not the type of damage for which Montclair would be liable.

In addition, an inverse condemnation claim requires a showing that governmental conduct has substantially impaired the land owner's use of the property. As case law makes clear, a natural water course within a subterranean culvert does not constitute an impairment on the land, but is itself a part of the estate. *Stanfield v. Schneidewind, supra,* 96 *N.J.L.* at 431, 115 *A.* 339; *see also Natland Corp. v. Baker's Port, Inc., supra,* 865 *S.W.*2d at 63–64 (adopting the holding in *Stanfield v. Schneidewind, supra* ). Thus, the existence of the culvert, alone, is insufficient to sustain a claim for inverse condemnation. As the motion judge observed, the Pinkowskis failed to indicate how the use or

---

[6] Whether Nishuane Brook appears on old or current topographical maps was apparently never explored. *See O'Neill v. State Highway Dept.,* 50 *N.J.* 307, 326, 235 *A.*2d 1 (1967); *Courter v. Borough of Lincoln Park,* 101 *N.J. Eq.* 572, 577, 138 *A.* 99 (Ch.1927).

value of the property, or both, was altered by the construction of the culvert.

Affirmed.